**Merritt DUNAVIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 65731.**

Court of Criminal Appeals of Texas, Panel No. 2.

Jan. 28, 1981.

Paul W. Leech, Grand Prairie, for appellant.

Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

OPINION

CLINTON, Judge.

In this probation revocation case the first ground of error is that a signed order revoking probation is not in the record. However, we have found one purportedly signed by the judge of the trial court and certified by the clerk of the court to be a true and correct copy of the order that appears of record in the stated volume and at the given page in the Criminal Minutes of the trial court. In pertinent part the order reads:

"The Court having heard and considered said motion [to revoke probation] and the

evidence submitted, it appears ... that said defendant has violated the terms of his probation in that he did knowingly and intentionally violated [sic] conditions (a) of his probation order.[1]

It is accordingly, considered, ordered and adjudged by the Court *that the probation be revoked* and original judgment became operative. * * *"[2]

The order further recounts the prior adjudication of guilt of the offense of theft of property and imposes sentence upon appellant for confinement for a term of not less than two nor more than ten years. Ground of error one is overruled.

The original conviction of appellant for theft of property is reflected by judgment of the trial court entered August 7, 1979 and grant of probation the same day. One condition specified is "a. Commit no offense against the laws of this State or any other State or the United States." Shortly—the timestamp bears a date that seems to be October 31, 1979—the affected district attorney filed a motion to revoke probation that alleged appellant committed four particularized violations of "condition (a)" on September 19, 1979, *viz*:

(1) That he did "knowingly and intentionally possess a motor vehicle, to-wit: a 1979 Explorer Pick-Up, that has had the manufacturer's permanent identification number removed, changed, and obliterated."

(2) That he did "knowingly and intentionally, committ [sic] an offense by changing, altering and mutilating the ve-hicle identification number on a vehicle, which was in his possession; to-wit: a 1979 Explorer Pick-Up, for the purpose of changing the identity of said vehicle."

(3) That he "knowingly and intentionally committed an offense by transporting liquor through a dry area, to-wit: Rains County, Texas."

(4) That he did "knowingly and intentionally drive on the wrong side of a road, to-wit: Farm to Market Road 515, which is a public road maintained by the State of Texas, thereby endangering himself and others."[3]

Because appellant urges error in overruling his pretrial motion to suppress which challenged the arrest and search that led to discovery of evidence of the first three violations alleged and also attacks evidentiary sufficiency in certain respects, we will trace the germane testimony and along the way deal with his remaining grounds of error.

It is evident that appellant was regarded by the law enforcement apparatus in and around Hopkins County as a consummate thief and an inveterate scofflaw, and with good reason: then a fifty six year old man, he did not pursue gainful employment, claiming a physical disability; his prior criminal record before the August 7, 1979 conviction for theft of property—a 1953 Ford Jubilee Tractor—included a 1952 felony DWI conviction and a 1945 conviction for bigamy; subsequently he was found guilty of appropriating a 1979 Ford pickup, knowing it had been stolen, on or about August 7, 1979[4]—the very day he was

---

1. Though appellant filed a pretrial motion requesting the trial court to specify in "full and written finding [sic] of fact" the grounds upon which revocation of probation is predicated, the court did not respond with written findings other than what is generally stated in the text of the order quoted above. The Court has said that failure to comply with a request for findings "may call for a reversal," *Tate v. State*, 365 S.W.2d 789, 791 (Tex.Cr.App.1963), but where, as here, the judge makes findings verbally that are recorded by the court reporter and appear in the transcription of his notes and they are also entered on the docket sheet, lack of a written exposition is not fatal, *Peach v. State*, 498 S.W.2d 192, 196 (Tex.Cr.App.1973), especially without a further request for addi-tional findings or clarification. *Valdez v. State*, 508 S.W.2d 842, 843 (Tex.Cr.App.1974).

2. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

3. We take this fourth allegation to mean that the danger inhered from driving on the wrong side of a road rather than from driving upon one maintained by the State of Texas.

4. This is the subject of our Cause Number 65,730, presently pending on appeal from an adverse ruling on a jointly held hearing to determine indigency for appellate purposes. During that hearing appellant testified that he re-

placed on probation. By the time of hearing on motion to revoke probation we may attribute to the judge of the trial court, therefore, some degree of familiarity with appellant and his perceived propensities.

■ Which, as a slight digression, leads us to ground of error two, that the trial court erred "in summarily" overruling appellant's motion for recusal, asserting factually that on September 10, 1979 the motor vehicle described in the motion to revoke probation *ante* was viewed by the judge in Emory, Rains County, and "certain facts were pointed out to him and certain information made known to him," thereby rendering the judge other than an impartial trier of fact in the revocation hearing. It must be understood that appellate counsel was not trial attorney for appellant, for that may explain his cavalier treatment of that portion of the record reporting the presentation of the motion for recusal. Appellate counsel faults the trial court for "although a judge knows he is not disqualified, the defendant should be given the opportunity to present evidence on the point, and the *refusal to do so, as in this case,* constitutes reversable [sic] error." Yet, the record shows that trial counsel for appellant stated to the trial court, *inter alia,* that he "would like for the Court *to rule* on" the motion, that his "information" was to the effect alleged in the motion, but "[o]f course, I already discussed this matter with you and you have indicated to me that you have no personal knowledge of these matters." The trial judge remarked that the "information" was untrue, and overruled the motion. To which counsel reacted with "All right. The next motion is..." Manifestly, trial counsel did not seek to present evidence in support of the motion, see *Coronado v. State,* 508 S.W.2d 373, 375 (Tex.Cr.App.1974), and certainly was not *refused* the opportunity to do so. Indeed, he was apparently satisfied with the record in the state he left it. Ground of error two thus presents nothing for review, and is overruled.

■ The next pretrial presentation was the motion to suppress evidence obtained by unlawful search and seizure following an unauthorized arrest, and in his ground of error three appellant claims the trial court erred in overruling his motion. There is in the record such a motion, and it does assail his arrest for an alleged traffic violation in that appellant "had not committed any offense within the presence or view of the arresting officer," and it does assert that the warrantless search that followed shortly was not authorized in the premises. The objects of the written motion are the identification numbers alluded to in the first two grounds of the motion to revoke, *ante.* However, appellant does not direct our attention to any indication in the record that the trial court ever ruled on that motion.

What happened is that during a colloquy concerning the motion to suppress appellant verbally expanded to include "anything obtained ... by the State," sought a ruling in it, but the trial judge explained that a ruling could not be made until facts were developed, so the court would "carry [it] along as we have the hearing" on the motion to revoke. There was no objection to that procedure. We thus come to pertinent facts that were developed by the State through its five witnesses, appellant not presenting any.

On or about April 17, 1979 Delbert Traylor, a selfemployed mechanic at his garage near Emory, bought and later cannibalized a wrecked blue 1976 Ford three-quarter ton pickup bearing vehicle identification number F25MLB28556. Thereafter, on a date not revealed by the record, Traylor sold what was left of the vehicle to appellant. That included "bits and pieces," photographs of which he identified as exhibits (but which are so dimly reproduced in our record as to be worthless), as well as the door to which the identification number plate was riveted; he also delivered a certificate of title to the skeleton that re-

sided at Route 1, Yantis, Hopkins County, eleven miles south of Sulphur Springs on Highway 154, on property owned by his brother.

mained. Shown a photograph of the 1979 Ford Explorer pickup appellant would later be found driving, Traylor spotted the license number and back bumper from the erstwhile 1976 Ford bolted onto the rear of the Explorer. His testimony, of course, bases the theory of the State that appellant somehow came into possession of the stolen 1979 Explorer and with some of the "bits and pieces" acquired from Traylor attempted to make it appear to be the 1976 Ford for which he had a certificate of title.

Jimmie Jacobs was employed as an investigator in the motor vehicle theft division of the Department of Public Safety, operating out of Garland. On September 10, 1979 he had "occasion to be" in Emory, Rains County; shortly before noon he also had "occasion to come into contact" with appellant; which is to say Jacobs, himself dressed in mufti and in a motor vehicle, saw appellant, whom Jacobs knew on sight,[5] alone in a Ford pickup at a stop sign. Appellant was seen to drive "on out 515," the Farm to Market Road designated in paragraph four of the motion to revoke. Jacobs testified that he observed "erratic driving" by appellant, speeding and driving in the center of the road and then back over to the edge[6] as he made his way away from Emory, and followed him until appellant turned off and stopped at a yellow house, before reaching an oil road, approximately three miles out of Emory. Observing this, according to Jacobs, he made radio contact with DPS Highway Patrolman Dempsey Bullock, stationed in Emory, and reported, "Something to the

effect that there is Old Merritt Dunavin going down Highway 515 driving all over the road, driving erratically . . . [s]ide to side and keep a lookout for him."[7] Although not that clear in the record, we gather that when appellant stopped at the yellow house the Jacobs vehicle went on past, for in relating what he saw thereafter Jacobs said he was about three hundred yards ahead of appellant, turned his head around[8] and watched as appellant made a right turn off FM 515 onto the oil road, followed by Bullock. As he maneuvered the Ford pickup to make the turn, according to Jacobs, appellant crossed over the center line.

Trooper Bullock was "catching up" to appellant just as he made the maneuver to turn, and he saw appellant "up in the center of the road across the center stripe" momentarily as he made his turn onto the oil road.[9] According to Bullock, "The only vehicles around was me and him," and he disclaimed knowledge that appellant was speeding. Bullock followed appellant on down the oil top road and stopped him with his overhead lights.

Bullock explained to appellant that he had stopped him for being on the wrong side of FM 515 and had to take him into Emory to see the judge. Appellant told Bullock that he wanted his vehicle to stay where it was and it was not to be touched; Bullock said, "[W]ell, that is all right with me." As appellant obtained cigarettes from the glove box, Bullock saw a case of

---

5. Other than his participation in the investigation of the earlier theft of the Ford Jubilee Tractor, the record as to prior familiarity between Jacobs and appellant was not developed, nor was his reason for being in Emory or whether he was alone in whatever vehicle he was in at the time.

6. This description was given by Jacobs on cross examination in clarification of his earlier statement that appellant was driving on the wrong side of the road.

7. For his part, Trooper Bullock recalled that he got a call, believed to be from Jimmie Jacobs, that "there was a pickup that was driving erratic" out on FM 515, and he proceeded to "where they were."

8. Jacobs merely said, without any real explanation, that at this point "I wasn't driving."

9. A moment later, asked to describe "his path," Bullock stated, "As he approached the county [oil] road with his pickup he swung his pickup over in the other—in the wrong lane. In other words, not completely over. It was just about halfway into the on-coming lane or left lane." Bullock first sighted the pickup being driven by appellant some half a mile before it turned off FM 515 onto the oil road, and as he traversed that distance behind appellant Bullock was unable to say that appellant "was going over the center stripe," since the first time he saw appellant "do it" was in making the last turn.

beer in the cab of the pickup but, Bullock agreed, that had no bearing on his arresting appellant for he had already told him the reason for the stop and that they were going back to see the judge on that account. It was locked, appellant keeping the keys. Back in Emory a judge could not be readily located—the time being about noon by now—and Bullock filled out a cash bond under which appellant had ten days in which to come back in and see the judge.[10] While this was being done, Bullock says he asked Mike Carter, Sheriff of Rains County, to go out to the location and "watch the vehicle."[11]

After he was first called by Jacobs, Trooper Bullock remained in radio contact with him, and talked with him "at different intervals." As he was stopping appellant on the oil road, Bullock was busy talking on his radio. Thus Jacobs, still on FM 515, learned that appellant had been arrested and was being taken to Emory, so he went to appellant's pickup because, Jacobs testified, "I knew wouldn't be anyone with it," and thought someone should be.[12]

The order in which Jacobs took certain actions after arriving at the scene is not clear, but he did acknowledge that when he "drove up" to it he "ran a 28 on it,"[13] and also that when he "pulled up and parked" he could see that the hood of the pickup "had been tampered with and changed out," explaining that the FORD nameplate on the front of the hood had been removed and the resultant holes puttied up,[14] and that the hood was that of a 1979 model whereas the grill was a 1976 vintage with a Ford nameplate on it. Jacobs looked through one of the rolled up windows and saw inside what he first merely called "liquor."[15] After that he just "waited," never really indicating for whom.

The Sheriff arrived, accompanied by Deputy Jimmy Roberts and Wood, the ABC agent. Wood walked up to the pickup, looked to the floorboard of the cab and saw a case of beer and two bottles of wine. Finding the doors to the cab still locked, Wood returned to the Rains County Courthouse to obtain the keys from appellant. Although they knew each other, Wood

10. Trooper Bullock was adamant that appellant did violate the law "as far as which side of the road he was supposed to drive on," and that is what Bullock stopped him for and carried him to the Judge in Rains County for. (An implication is introduced more than once that the location of the stop of appellant is not in Rains County, but Bullock seems certain that they were still within the county.) Bullock also flatly stated that appellant was not "drunk" at the time or he would have arrested appellant for that offense, but there was not a strong smell of alcohol on him and his speech was not slurred. Nor could he prove that appellant was speeding.

11. The Sheriff did not testify, but Wayne Wood, an Alcoholic Beverage Commission agent who rode with Sheriff Carter to the scene, recalled the Sheriff asked him to go out with him after Sheriff Carter received a radio call "to come out there." At that point, by all accounts, only Jacobs was still in the neighborhood and, as shall be related shortly, approached appellant's locked pickup when he knew it "was alone." But Jacobs expressly denied calling for the Sheriff, his understanding being that Bullock had "sent" the Sheriff to the scene.

12. One cannot help but be intrigued about the solicitous attitude expressed by Jacobs who earlier had testified that, though possessed of

the same authority as Trooper Bullock, because he did not work in a uniform symbolizing his authority, Jacobs does not stop traffic violators —"I haven't yet," he testified, in five years. One must wonder, then, just what motivated him to keep appellant's movements under surveillance even after Bullock responded to his call.

13. We understand that this means Jacobs radioed some DPS office, communicated the license plate number on appellant's pickup and then received back a report of certain data with respect to it, including the information that the pickup to which that license number was recorded was a 1976 model.

14. Asked if the owner of a pickup violated the law by removing a nameplate, Jacobs replied, "Well, it seemed to me to be silly to remove the factory stuff on it and leave the gum and putty," but he conceded that being "silly" is not against the law.

15. On redirect, when asked what he saw inside the pickup, Jacobs expanded his response to "some bottles," "some beer," and said "they" appeared to be "liquor; alcohol." Also, he freely admitted that he was not familiar with the alcoholic beverage laws.

nevertheless introduced himself to appellant, asked for the keys, telling him he wanted them because of "that alcohol that is in his pickup out there." Then the following:

"Q: Did he have any protest about it?

A: Just a little bit, yes, sir. At first he told me I couldn't have the keys. Then, I said, well, I need to get that out of there.

Q: What did he say then?

A: And there were some people standing around. He said, y'all all witness this, don't you. And, I don't know what they said but anyway he handed me the keys and come on."

Back at the scene on the oil road Wood unlocked and opened the door and from the cab of the pickup removed containers of liquids which, he would later testify, are alcoholic beverages. As this was being done Jacobs examined the VIN plate[16] affixed to the left door; it reflected the Ford pickup was a 1976 model, but Jacobs observed that the expansion rivets holding the plate to the door area were not in their normal condition that they should be after being attached by the manufacturer. He made other observations that were consistent with the pickup being a 1976 model. The same afternoon Jacobs "filed a seizure" on the pickup[17] and, as we understand his testimony, thereafter removed the VIN plate.

The testimony from Traylor, the mechanic, Investigator Jacobs, Trooper Bullock and Agent Wood and the photographs taken and other tangible exhibits were all received and admitted as evidence during the course of the hearing either without any objection or over some objection *other than* being fruits of an unauthorized arrest or of impermissible warrantless searches and seizures. At the conclusion of presentation of the evidence, the State requested the trial court to take judicial notice of certain statutory provisions, both sides rested and then presented argument to the court. At no time during the winding down of the hearing did the appellant renew his initial motion to suppress for a ruling nor object to the failure of the trial court to make one. Accordingly, such assertions in and under this ground of error must be rejected simply because, contrary to the claim, the trial court did not overrule the motion to suppress. Nor may we rule out any forbidden fruits for appellant did not object in the record to their being admitted and obtain an adverse ruling from the trial court.[18] Thus, in this respect nothing is presented for review. *Writt v. State,* 541 S.W.2d 424, 426–427 (Tex.Cr.App.1976), and see *Roberts v. State,* 545 S.W.2d 157, 158 (Tex.Cr.App. 1977).

Taking a somewhat different tack, appellant points out that in defending against revocation of probation he attempted to show that his arrest by Trooper Bullock was a "sham" and done only to remove him from the pickup and take him three miles away from it back to Emory, in order for Jacobs, lacking probable cause to confront appellant, to make his warrantless approach to appellant's isolated pickup. His complaint is that the trial court not only consistently sustained objections by the State but finally "cut him off" from making his

---

**16.** This is a small piece of metal on which is stamped by the manufacturer, among other data, a vehicle identification number (VIN), Article 6687–1, § 21, V.A.C.S., the Certificate of Title Act. Section 49 of that Act proscribes a multitude of unlawful acts pertaining to the VIN, subsection (b) and (c) of which are particularly invoked by the State in the case at bar.

**17.** Presumably Jacobs was alluding to the process provided by Section 49(d), Article 6687–1, supra, whereby an officer who arrests a person for a violation of the section may seize and take custody of the motor vehicle and then "shall prepare and deliver to a magistrate a

written inventory" of the seized vehicle. He took this action, Jacobs testified, "Because I intended to keep it until I could identify it."

**18.** "It is clear that protection afforded by the Fourth Amendment and Article I, Sec. 9, Texas Constitution, extends to probationers," *Tamez v. State,* 534 S.W.2d 686, 692 (Tex.Cr.App. 1976). Thus, when properly preserved and presented, the contention that lack of probable cause to arrest tainted a subsequent search and its fruits is routinely addressed by the Court, e. g., *Jimmerson v. State,* 561 S.W.2d 5, 6–7 (Tex. Cr.App.1978).

"pretext" defense. Recognizing that the series of intrusions did commence with the stop and arrest by Bullock, we shall deal with this aspect of his argument as we treat his remaining four grounds of error.

Thus, the allegations in the first and second paragraphs of the motion to revoke are the product of the investigation and seizure by Jacobs; the third paragraph is the consequence of seizure of alcoholic beverages by Wood; the fourth may be derived from the observations of Jacobs and Bullock, but the arrest and charged violation came from the latter's alone, the single instance of aberrant conduct being engaged in his presence and within his view. Section 153, Article 6701d, V.A.C.S., and Article 14.01, V.A.C.C.P., *Drago v. State*, 553 S.W.2d 375 (Tex.Cr.App.1977) and *Soileau v. State*, 156 Tex.Cr.R. 544, 244 S.W.2d 224 (1951). We are reminded that to uphold any one of the alleged violations obviates necessity of considering any others, and it is suggested that the fourth paragraph is easily and readily sustainable.[19]

A review of the statute and decisions touching it and its predecessors, however, reveals problems; see, e. g., *Lane v. State*, 305 S.W.2d 595 (Tex.Cr.App.1957); *Martinez v. State*, 288 S.W.2d 787 (Tex.Cr.App. 1956); see also Wilson, Criminal Forms (Eighth Edition) by Morrison and Blackwell, § 25.14, 7 Texas Practice 157.

From these authorities we observe that the rule of the road directed by Section 52,[20] Article 6701d, supra, is that "a vehicle shall be driven upon the right half of the roadway" with prescribed exceptions for driving on the left side of the road. For, as the Court has often pointed out, it is not unlawful per se to drive on the left side, *Morgan v. State*, 135 Tex.Cr.R. 402, 120 S.W.2d 1063 (1938). Since the advent of the motor vehicle it has been so. See former Article 801(A), 1925 Penal Code; *Ex parte Williams*, 128 Tex.Cr.R. 148, 79 S.W.2d 325 (1935). (We mention exceptions only as an indication of legislative intent; their factual applicability is not invoked here.) Consistent with the intent perceived early on by the Court in the cases and by the commentators cited *ante*, the offending conduct to be alleged and proved is "the driving of the automobile on the left side" of the roadway except under certain conditions—not "to drive on the wrong side of a road," as the motion to revoke alleges here[21] and the parlance of the parties and some witness reflects. As a pleading in a criminal case, the motion to revoke would not pass muster, either under the former law, *Morgan v. State*, supra, or its successor, *Lane v. State*, 305 S.W.2d 597–598[22] (Tex.Cr.App. 1957) (On Motion for Rehearing).

In his ground of error seven appellant argues, as he did to the trial court, that

19. The reminder and suggestion come from our State's Attorney in a brief filed directly with the Clerk of this Court November 12, 1980, rather than the clerk of the trial court. The affected District Attorney has not filed a brief at all, but we know his position on the issues from closing argument to the court below. The brief for appellant was filed in the trial court July 20, 1980, and the record does not show that the State was granted any extension beyond the regular thirty days in which to file its brief under Article 40.09, subd. 10, V.A.C.C.P. Nevertheless, appellant has not complained of this tardy brief through motion to strike or otherwise.

20. Only Section 52, supra, was explicitly cited to the trial court by the State, and testimony adduced from Trooper Bullock indicates that it is what the prosecutor had in mind. The State's Attorney *now* says the driving observed by Bullock violated both Section 52 and Section 60, Article 6701d, supra.

21. There was filed and partially presented to the trial court a motion to quash the motion to revoke, one paragraph of which does challenge the fourth paragraph of the motion to revoke— but on a basis of what the anticipated evidence would show rather than defects on the face of the motion. To the extent that ground of error seven complains of denying the motion to quash, it is overruled.

22. "[T]he form of information set forth in *Martinez [v. State, supra]* would be a proper way upon further prosecution growing out of this offense to allege such a violation..." But in the absence of a motion to quash directed to the defect, we will not gratuitously set aside an order of revocation, *Gordon v. State*, 575 S.W.2d 529, 531 (Tex.Cr.App.1978), particularly where, as here, the motion to quash reflects an awareness of that which appellant and his attorney were being called on to defend, cf. *Garner v. State*, 545 S.W.2d 178, 179 (Tex.Cr. App.1977), and the sufficiency of one or more additional grounds to revoke is not attacked.

"the slight 'swing' outward" by his pickup in making a right turn is "not unusual" and in this instance he certainly was not "endangering himself and others," as alleged, since there were no other vehicles near his, Trooper Bullock being some half mile behind and Investigator Jacobs being some three hundred yards ahead but, as we understand his testimony, still traveling on FM 515 beyond the turn off to the oil road. We agree.

The most shown here is that as he approached the "Y" formed by FM 515 and the oil road, appellant "swung" his pickup to the left so that a portion of the body of the pickup crossed over the center line. In *Ex parte Williams*, supra, on motion for rehearing, then Presiding Judge Morrow wrote that in interpreting the former statute, "the circumstances under which it would become effective in a given case and the purpose for which it was enacted should properly be taken into account." Doing so

in the case at bar, we are constrained to find that the act of appellant as observed by Trooper Bullock does not constitute an offense denounced by Section 52, supra. That the State, through our State's Attorney, deems it advisable to submit that act of driving across the center line also violated Section 60 [23] of the same article—with which appellant, of course, was *not* charged—reveals an awareness of the tenuousness of its position. But Bullock's mistake is not shown to be a pretext.

The third paragraph of the motion to revoke charges appellant with intentionally and knowingly "transporting liquor through a dry area, to-wit: Rains County . . ." The trial court found that had been done but added a finding that the quantity of liquor [24] was "more than the legal amount," presumably because the parties had jousted with witnesses and each other over just what are the essential elements of the offense sought to be alleged. [25] Our own anal-

23. "Sec. 60. Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
    (a) The driver of a vehicle shall drive as nearly as practicable entirely within a single lane and shall not be moved [sic] from such lane until the driver has first ascertained that such movement can be made with safety."

24. The Alcoholic Beverage Code (Code) explicitly defines and delineates those terms that common parlance does not so nicely differentiate. Thus, "alcoholic beverage" under § 1.04(1) means "alcohol, or any beverage containing more than one percent of alcohol by volume . . ." which embraces both liquor and beer; § 1.04(5) defines "liquor" as "any alcoholic beverage containing alcohol in excess of four percent by weight . . .," and proof that an alcoholic beverage is, say, wine is *prima facie* evidence that it is liquor; but "beer," according to § 1.04(15), is "a malt beverage containing one-half of one percent . . . and not more than four percent of alcohol by weight . . ." We assume the allegations, statements, questions, answers and findings in the record in these respects were given and taken in their technically defined meanings.

25. Illustrative are the following exchanges while ABC Agent Wood was being cross examined:
    "Q: Well, let's go back to something else. You said this was a dry territory and he had more than the legal amount. What is the legal amount?

A: Thirty-two fluid ounces [of liquor].
    \*      \*      \*      \*      \*      \*
Q: Where did you get that information?
    [PROSECUTOR]: Your Honor, we would object to asking him where he gets the law. He gets the law from the law. It is irrelevant and immaterial.
    THE COURT: Sustained.
    [DEFENSE COUNSEL]: It is not in the Code.
    THE COURT: Well, I sustain the objection."
Appellant's attorney then pointed out that the motion to revoke did not allege anything about whether appellant "had more than the legal amount," and resumed his questioning of Wood:
    "Q: Now, is it against the law to transport liquor through a dry area?
A: You can do it with a permit, a legal permit.
Q: Is that the only way you can do it?
A: You can transport liquor in the legal amount through a dry area.
    [DEFENSE COUNSEL]: I'm going to object to the statement on the part of Mr. Wood as to legal amount until the State of Texas proves what is the legal amount. Hasn't been shown yet. The burden of proof is upon them."
Counsel's request that Wood read § 107.08 of the Code was thwarted by a sustained objection, but he heard it given as the court took "judicial notice" of its provision. Wood then agreed that quantity is not mentioned; however, he returned to his earlier understanding:

ysis of a basically regulatory and patently complex code leads to the conclusion that with respect to merely transporting an alcoholic beverage in a dry area—and that is the simple allegation made by the State— the amount being transported is of no consequence in determining that offense.

Section 101.31 of the Code provides, as pertinent here:

"*Except as otherwise provided in this code*, no person in a dry area may... transport... or possess with intent to sell an *alcoholic beverage*."

This proscription, we note significantly, does not include mere *possession* and is barren of any suggestion as to an amount of the alcoholic beverage.

Section 101.32, however, establishes a formula for *prima facie* evidence of *intent to sell*, viz:

"(a) Possession of more than one quart of liquor in a dry area is prima facie evidence that it is *possessed with intent to sell.*

(b) Possession in a dry area of more than 24 twelve-ounce bottles of beer, or an equivalent amount, is prima facie evidence of *possession with intent to sell.*"

As a general proposition, § 11.01(b) and (c) allow that "a person may... transport... liquor, if the right or privilege of doing so is granted by this code," and, further, that any "right or privilege granted by this section as an exception to prohibitions contained elsewhere... may be exercised only in the manner provided." More specifically, § 107.08, to which right or privilege appellant lays claim, provides:

"A person who purchases an alcoholic beverage for his own consumption may *transport* it from a place where its sale is legal to a place where its possession is legal without holding a license or permit."

From these statutory provisions it is apparent that several legal conclusions obtained from the former codes are still viable *with respect to a dry area.*

■ First, possession of an alcoholic beverage, without more and regardless of the amount, is not an offense. *Alston v. State*, 154 Tex.Cr.R. 148, 226 S.W.2d 443, 445 (1950); *Walton v. State*, 144 Tex.Cr.R. 335, 163 S.W.2d 203, 204 (1942); *Jones v. State*, 579 S.W.2d 240, 241 (Tex.Cr.App.1979).

■ Second, possession of an alcoholic beverage with intent to sell is an offense, *Jones v. State*, supra, regardless of the amount, *Alston v. State*, supra.

■ Third, the gravamen of the offense of possession with intent to sell is not the fact of possession but the "reason" for possession, *Jones v. State*, supra, to which the "presumption" flowing from the amount of alcoholic beverage possessed may aid in establishing, *Alston v. State*, supra; without its benefit, the State must discharge the burden of proving a lesser amount was possessed with intent to sell (or, as the old code had it, for purpose of sale), *Walker v. State*, 144 Tex.Cr.R. 363, 163 S.W.2d 207 (1942); just as an accused is permitted to show that more than a *prima facie* amount is possessed for a reason other than sale, *Ellison v. State*, 154 Tex.Cr.R. 406, 227 S.W.2d 545, 549 (1950); *Piper v. State*, 116 Tex.Cr.R. 378, 34 S.W.2d 283 (1931).

■ Fourth, transporting an alcoholic beverage is made unlawful without regard to any special intent or purpose, *Abston v. State*, 157 Tex.Cr.R. 500, 250 S.W.2d 214 (1952), such as for the purpose of sale, *Wright v. State*, 168 Tex.Cr.R. 645, 330 S.W.2d 620 (1960); *Gaines v. State*, 157 Tex.Cr.R. 105, 247 S.W.2d 251, and 157 Tex. Cr.R. 102, 247 S.W.2d 253 (1953). It follows, then, that the amount of alcoholic beverage being transported is irrelevant. See *Royal v. State*, 156 Tex.Cr.R. 492, 244 S.W.2d 239 (1951); *Harris v. State*, 149 Tex. Cr.R. 610, 198 S.W.2d 459, 460[26] (1946);

---

"A: I testified that if you have possession of more than thirty-two ounces it is prima facie evidence, if that's what you are referring to."

**26.** "Of course, it was incumbent upon the State to prove that he transported whisky as that was the descriptive of the article transported, but this did not require the State to prove the exact quantity of whisky transported. *The*

*Gandy v. State*, 99 Tex.Cr.R. 143, 268 S.W. 951, 955 (1925) (Hawkins, J. concurring).

■■■■ Finally, the protection of § 107.08 in transporting an alcoholic beverage for one's own consumption from the place of purchase where its sale is legal to a place where its possession is legal is not lost by reason of the amount being transported in those circumstances, *Brooks v. State*, 154 Tex.Cr.R. 512, 228 S.W.2d 863, 864 (1950) (six pints of whiskey) and *Walton v. State*, supra, (two gallons of wine along with two half pints of whiskey), but the accused must invoke and prove that exception to application of the prohibitory statute. *Brooks v. State*, supra.

Appellant recognizes the rule of *Brooks v. State*, but contends it has been superceded by provisions of V.T.C.A. Penal Code, § 2.02,[27] so that since the State here did not negate the protection afforded by § 107.08 the trial court erred in revoking his probation on this ground. For its part the State argues that § 2.02 applies only to labeled exceptions in the Penal Code and is not to be extended to the Alcoholic Beverage Code. The competing arguments require that we address a part of the broad question specifically left unanswered until another day in *Jones v. State*, 579 S.W.2d at 241, n. 1, to-wit: whether Titles 1, 2, and 3 are applicable to the Code through operation of V.T.C.A. Penal Code, § 1.03(b), which impresses the provisions of those three titles upon offenses defined by other laws, "unless the statute defining the offense provides otherwise."

■■■■ In the Code, enacted in 1977 to become effective September 1, 1977—more than three years following the effective date of the Penal Code—§ 101.05 provides

that a charging instrument alleging a violation of the Code "need not negate an exception to an act prohibited by this code, but the exception may be urged by the defendant as a defense to the offense charged." It is by reason of this provision, coupled with operation of the "unless" clause of § 1.03(b), supra, that § 2.02, supra, does not govern the manner of alleging and proving an offense proscribed by the Code. The *Brooks* rule has not lost its vitality. Thus, not having invoked and proved the exception of § 107.08, appellant may not now claim its protection.

■■■■ The testimony of ABC Agent Wood demonstrates that appellant violated the proscriptions of § 101.31 of the Code by transporting in a dry area alcoholic beverages, namely beer and wine, September 10, 1979. His account may not be excluded as the product of an unauthorized arrest followed by an impermissible warrantless search of appellant's pickup because appellant did not voice any objection under the Fourth Amendment or Article I, Sec. 9 of our Bill of Rights to it and its fruits being admitted.[28] Therefore, the allegations in the third paragraph of the motion to revoke are supported by a preponderance of the evidence, and ground of error six is, accordingly, overruled.

Having found a violation of a condition of probation as alleged in the third paragraph of the motion to revoke the trial judge was authorized to order probation for appellant be revoked on that basis alone, if so advised. *Flournoy v. State*, 589 S.W.2d 705 (Tex.Cr. App.1979). Therefore, we need not consider the other grounds of error implicating the first[29] and second paragraphs[30] of the motion to revoke.

*quantity of whisky was not descriptive of the offense charged, but related solely to the quantity transported.*"

27. In pertinent part, § 2.02(b) requires the prosecutor to negate the existence of a stated exception in the charging instrument and in his proof beyond a reasonable doubt that that offensive conduct does not fall within the exception.

28. Since the presence of Wood at the oil road scene appears to be purely fortuitous—Sheriff Carter asked him to come along—we cannot say that he was a knowing participant in some kind of charade, sham or pretext claimed by appellant.

29. Suffice to say that Jacobs testified without contradiction that his inspection of the pickup

There being no abuse of discretion, the judgment is affirmed.

DALLY, J., concurs in result.

being driven by appellant revealed frame numbers and "other numbers" that had been "changed out" to make them consistent with the VIN plate for a 1976 model Ford.

30. As to the VIN Jacobs removed from the door of the 1979 Ford Explorer, it is appropriate to remark that it is number F25MLB28556, that from the 1976 skeleton appellant bought from Traylor.