

NUMBER 13-19-00326-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

OSCAR DAVILA RODRIGUEZ,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

On appeal from the 139th District Court
of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina
Memorandum Opinion by Chief Justice Contreras**

In 2008, a jury convicted appellant Oscar Davila Rodriguez of murder, a first-

degree felony.[1] *See* TEX. PENAL CODE ANN. § 19.02(b)(1). Free on bond pending the jury's

---

[1] Rodriguez was first indicted and tried for murder in 2006. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). A jury found Rodriguez guilty and assessed punishment at fifty-five years' imprisonment. *See id.* § 12.32. The trial court granted a new trial, from which this appeal stems.

verdict, appellant absconded during the guilt-innocence phase of trial. The jury convicted appellant in his absence and assessed punishment at forty years' confinement. *See id.* § 12.32. Appellant's sentence was eventually pronounced on November 26, 2018, following his apprehension in Mexico and return to Texas. *See* TEX. CODE CRIM. PROC. ANN. art. 42.03(a) (noting that sentence must be pronounced in the defendant's presence). Appellant filed an untimely notice of appeal, and we dismissed the appeal for want of jurisdiction. *Rodriguez v. State*, 13-19-00105-CR, 2019 WL 1562006, at *1 (Tex. App.—Corpus Christi–Edinburg Apr. 11, 2019, no pet.) (mem. op., not designated for publication); *see* TEX. R. APP. P. 26.2. Appellant filed a writ of habeas corpus seeking an out-of-time appeal, which the Texas Court of Criminal Appeals granted. *Ex parte Davila Rodriguez*, WR-89,943-01, 2019 WL 2439408, at *1 (Tex. Crim. App. June 12, 2019) (not designated for publication); *see* TEX. CODE CRIM. PROC. ANN. art. 11.07. This appeal followed.

By six issues, appellant contends: (1–2) the trial court erred by denying his motion to suppress his statement of accused; (3) the trial court erred by failing to properly instruct the jury under Articles 38.22 and 38.23 of the Texas Code of Criminal Procedure; (4) trial counsel was ineffective by failing to request Articles 38.22 and 38.23 instructions or object to their absence; (5) the trial court erred by admitting "extraneous-matter evidence in violation of Texas Rules of Evidence 401, 404(b)[,] and 403"; and (6) the trial court erred by denying his motion for new trial "based on newly discovered evidence." We affirm the trial court's judgment.

2

# I. BACKGROUND & PROCEDURAL HISTORY

## A. Nydia Maldonado is Found Deceased in Her Home

Nydia Maldonado lived at home with her mother, Nora Maldonado, and stepfather, Eliseo Ibarra. Ibarra testified at trial that as he returned home after work on the evening of October 31, 2005, at approximately 7:30 p.m., appellant arrived at the same time. Appellant, Nydia's ex-boyfriend, informed Ibarra that he was worried about Nydia, as she had not answered his telephone calls to her that day. Observing Nydia's car at the house, Ibarra stated that Nydia must be inside. The two attempted to enter the home, but the front door was latched from the inside. Because he did not have a key to the back door, Ibarra grabbed a pair of pliers and wrested open the front door. Ibarra headed straight to Nydia's room, where he found her purple, swollen, and with two puncture wounds in her neck.[2] Ibarra testified that he left the room, instructed appellant to call 911, and called his wife to inform her of his discovery.

Appellant dialed 911 and, per the 911 transcript, stated that his "cousin just committed suicide" and had been dead for "a couple hours." Appellant later clarified that the deceased was his ex-girlfriend and implored the operator to have an officer sent to the home. Moments later, at approximately 7:49 p.m., Officer Omar Caballero of the McAllen Police Department (MPD) arrived to secure the scene.

Lead MPD investigator in this case, Clemente Blanco, was called to the scene. Blanco testified that he briefly questioned appellant at the Maldonados' home and that

---

[2] Pathologist Flugencia Salinas testified at trial that Nydia died "as a result of asphyxia by strangulation, and three stab wounds on the right side of the neck that led to punctures of the right jugular vein."

3

appellant was cooperative. Blanco noted that appellant informed him that appellant went to Nydia's house that day to check on her because she was not answering his phone calls. Appellant told Blanco that he was Nydia's ex-boyfriend. Appellant also informed Blanco that Nydia and a male friend of hers, whom he knew as Clone,[3] were at Nydia's house late in the previous evening or earlier that morning, and that appellant knew where Clone lived. Given that information, Blanco thought it prudent to ascertain Clone's whereabouts.

Blanco testified that appellant agreed to accompany him to the police station to continue answering questions and to show him where Clone lived on the way. Because appellant's truck was contained within the secured crime scene, Blanco drove appellant past Clone's house and then to the police station. Blanco testified that appellant rode in the front passenger seat of his police vehicle and that, at that point, appellant was not a suspect.

## B. Investigator Blanco Interviews Appellant

At about 10:00 p.m., Blanco and appellant entered the police station. Blanco led appellant into his office to begin the interview. Blanco again testified that appellant was not a suspect, detained, or under arrest at that time, and was free to leave if he chose to do so.

Blanco initially interviewed appellant for "several hours," beginning with questions about appellant's background. Appellant stated that Nydia had recently ended her relationship with him, that Nydia was somewhat depressed, that she and appellant

---

[3] Clone's legal name is Eluid Cadena. The parties refer to Cadena as Clone, and we will as well.

4

remained friends, that she would occasionally request money from appellant, and that appellant would give her money. Appellant informed Blanco that he had gone to Nydia's house on October 30, the day before the murder, on four occasions to give her money, but he did not find her there. Appellant told Blanco that he also went to Nydia's house at approximately 2:30 a.m. on October 31; at that time, Nydia answered the door, they argued over Clone, whom appellant believed to be dating Nydia, and Nydia asked him to leave.

Having previously been informed of aspects of appellant's 911 call, Blanco followed up on why appellant believed that Nydia had committed suicide and was dead for a couple of hours by the time he and Ibarra found her body. Appellant told Blanco that he watched the Discovery Channel and that he had seen "shows [involving] the dead people." Blanco testified that he left his office a few times during his interview with appellant to "exchange notes" with and discuss the findings of the other investigators on the case who were then interviewing other relevant individuals.

Blanco stated that between 3:00 a.m. and 4:00 a.m., now November 1, he became suspicious of appellant, believing appellant "was not being truthful," and the interview turned "accusatory." Blanco read appellant the *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and moved appellant into an interrogation room.[4] Blanco testified that even when he changed his interview approach, appellant was not under arrest. Blanco attested that appellant consistently denied wrongdoing. Appellant told Blanco that while, at times, he had thoughts of wanting to harm Nydia, he would never do so because

---

[4] Blanco testified at a pre-trial hearing that appellant agreed to undergo a polygraph examination, so he moved appellant to the room in which polygraphs were administered.

5

he loved her. Blanco stated that appellant consented to being fingerprinted and photographed, and that the interrogation lasted until approximately 12:00 p.m. At that time, appellant was transferred to a holding cell.

## C. Investigator Phillip Kucia's Investigation & Appellant's Confession

MPD investigator Phillip Kucia testified that at approximately 7:00 a.m. on November 1, he was instructed by his lieutenant to find appellant's house and to collect appellant's clothing from the day prior, which he did. Kucia arrived at appellant's house and was greeted by appellant's father. Kucia asked for consent to enter the home to collect the clothing, which appellant's father granted. Crime scene investigators arrived to collect the clothing and then Kucia returned to the police station at approximately 11:00 a.m. Upon his return, Kucia met with Blanco and other investigators to exchange information relative to the murder investigation. Blanco informed Kucia that he believed appellant was being untruthful, and Kucia requested the opportunity to speak with appellant.

At approximately 1:00 p.m., appellant was brought from his holding cell into an interview room, and Kucia began questioning him. Kucia "explained [his] reason for being there," and asked appellant if he was willing to talk. According to Kucia, appellant agreed to talk. Kucia testified that he reread appellant the *Miranda* warnings and began his questioning. Kucia first asked appellant if he was upset with Nydia. Appellant stated that he was upset with Nydia because he believed that Nydia and Clone were dating. Kucia then told appellant that he was at appellant's parents' house earlier in the day to collect his clothing. Kucia testified that at that moment, appellant "started crying."

Kucia "emphasized with [appellant] that [the investigators] wanted to know the truth. [The investigators] wanted to know what happened last night." Kucia stated that appellant then "bent down" and said "well, I may have killed her." Kucia asked appellant "what he meant by that." Appellant stated that he "went over to [Nydia's] house around 5:00" p.m., and "didn't mean to hurt [Nydia]." Kucia asked appellant if he was willing to give a written statement, and appellant answered in the affirmative. Kucia read appellant his *Miranda* rights, and began taking appellant's statement. According to Kucia's testimony: Kucia informed appellant that he was entitled to an attorney, but appellant did not request one; appellant was told that he could terminate the interview at any time but proceeded to give a full statement; and appellant was not threatened or promised anything in return for his statement.

Kucia testified that he read appellant's statement back to him in the presence of two witnesses, Diana Villarreal and Marisela Hernandez, and appellant and the witnesses each signed the statement. The statement read as follows:

My name is Oscar Rodriguez. I was born on 10/25/83. I am 22 years old. . . .

I would like to say that on Monday, 10/31/05, at about 5:00 p.m., I got off work and I drove to my ex-girlfriend, Nydia Maldonado's house in my black 2003 Chevrolet step side pick[]up. I drove to her house in south McAllen. . . . Before I drove to her home I talked to my dad face to face and I told him that I was having major problems with Nydia. My dad did not say much, because I did not give him much information.

I first met Nydia in January of 2000. We met in a park. We have been in an on and off relationship for the last couple of years.

On Monday, 10/31/05, I arrived at her home and I saw her Black Cougar was parked on the street in front of her home. This was about 5:00 p.m.

I got out of my truck and I walked up to the house. I went to the house to

7

talk to her about our relationship and the problems that we have been having.

I walked up to the front door and I knocked on the door, but Nydia did not answer. I then walked around to the side of the house where the second door was and I saw that it was slightly open. I then pushed the door open and I walked inside the house. I walked to the back of the house near Nydia's mom's room. When I got to the room I could see that Nydia was in her mom's bed in her pajamas watching T.V. Nydia then got out of the bed and asked me what I was doing inside the house. I told her that the door was half[]way open so I walked in. I told her that I wanted to talk about our problems and I wanted to know what was going on between her and Clone. I do not know Clone's name, but I believed he was having an affair with Nydia.

When I asked her what was going on with her and Clone, she refused to answer my questions. Nydia began to get aggressive and she told me several times to get out of the house.

As Nydia is telling me to get out of the house she starts hitting me. . . . By this time we were already in her room. Her room is right across from her mom's room.

I then defended myself and I grab[bed] her by the neck with both of my hands and I squeezed her neck. As I was squeezing her neck, I was trying to talk to her but she would not respond to my questions. This made me upset.

I then threw her to the ground and I got on top of her and I got even more upset so I squeezed her neck a little harder. I then notice that she is turning purple. As she is turning purple, I notice a pair of tw[ee]zers on the bed. I then grab the tw[ee]zers and I stab[bed] her on the right side of the neck about two times. I don't know what my intentions were when I was stabbing her. After I stabbed her I realized that she was not breathing anymore. I then threw the tw[ee]zers some[]where in the room.

I then grabbed the beige blanket that was on her bed and I covered half of her body with it. I then grabbed the white pillow and I put it under her head. I did this to make her feel comfortable the way she was laying down.

After covering her up, I walked out of the bedroom and I walked out of the house thr[ough] the side door. I closed the door as best as I could when I left.

8

I then walk[ed] over to the neighbor's house and I spoke with a man who was outside. I asked him if [he] had seen Nydia at all today and he told me no. I then gave him my business card and I told him to call me if he sees her. . . .

I then drove to my home in Mission in my black truck. . . .

I got to the house and undressed and I put my dirty clothes in the laundry room of our home. I was wearing light colored blue jeans, my blue tele pro work shirt[,] and my brown booties. . . . I then took a shower and I changed clothes and I left the house. By this time it was about 7:00 p.m. or so. I then drove back to Nydia's house.

On my way to Nydia's house, I called her stepfather Eliseo [I]barra, on his cell phone, but he did not answer his phone.

I arrived at Nydia's house and Eliseo was already there at the house. He was trying to open the front door, but it was locked with the latch. He did not have a key to get in. Eliseo then used another key and we opened the door. Eliseo then pushed open the door and we went inside.

When we went inside Eliseo yelled at me to call "911." Eliseo told me that he thought she was already dead. I was in shock at that time, because I did not think that I had killed her. I felt really bad.

I then call[ed] "911" and I told the dispatcher that she had com[m]itted suicide. I told them that because I knew that I had stabbed her twice. I thought they might believe that it was suicide.

I would like to say that I did not mean to kill Nydia. I loved her very much. I never wanted to hurt her.

This is all I wish to say.

## D.    Extraneous-Matter Evidence

Multiple witnesses testified as to appellant's history of following Nydia and threatening her and her male friends. The facts surrounding such testimony were gathered by MPD investigators both as Blanco was interviewing appellant at the police station on the day of and after the murder, as well as in their extended investigation.

9

Officer Joel Hernandez, the second MPD officer to respond to the crime scene, testified that he arrived to secure the scene and make a list of everyone who entered the home. Hernandez did not initiate questioning of appellant at the scene; however, appellant approached Hernandez and "just kept [telling Hernandez]," among other things, that "he used to be real jealous and possessive of his girlfriend, of [Nydia]. He just kept talking and saying that he wasn't like that no more, that he would do anything for her, even if it meant to cancel plans with his friends." Appellant informed Hernandez that Nydia was "talking to some other male named Clone."

Nancy Olguin, Nydia's brother's partner, testified that she was often at Nydia's home. There, she witnessed the friendship of Nydia and appellant, which Olguin stated initially "seemed like a normal friendship." Over time, however, Olguin saw the friends get in many arguments. Olguin stated that they fought mainly because appellant "would get jealous . . . that [Nydia] was going out, that she wasn't answering [appellant's] calls, that [Nydia] didn't want to go with [appellant] places." Things got particularly bad when Nydia went to prom with a different individual, Tony Chavez, whom she was dating at the time. Olguin also noted that she was at Nydia's house the night of October 30 and saw appellant driving by the house on three occasions. Olguin detailed that on the day of the murder, appellant called her about thirty times. On the instances that she answered, Olguin stated that appellant was getting progressively more frustrated about his inability to get in contact with Nydia that day.

Olguin testified that she was informed of Nydia's death by her partner, Nydia's brother Jorge Alberto Maldonado, who was out of town. Jorge asked Olguin to drive to

the house on his behalf, which she did. Officer Caballero testified that when Olguin arrived at the crime scene, "immediately[] upon recognizing what had happened," she pointed at appellant and stated, "Do not let that guy go. Whatever you do, do not let him go." Olguin was asked why she made that statement, and she answered that appellant had been stalking Nydia since their breakup.

Jorge testified that appellant consistently called Nydia and made her cry. Jorge described one occasion where Nydia ignored appellant's incessant phone calls one day. Appellant proceeded to drive to and enter Nydia's house, apparently unaware that Jorge was home. Jorge caught appellant sneaking into the house, grabbed appellant by the neck, put him against the wall, and asked appellant, "What the fu[-]k are you doing here?" Appellant answered that he was "checking up on Nydia." Jorge responded, "well, she's not answering for a reason" and proceeded to "ban" appellant from the house.

One of Nydia's closest friends, Joanna Claudia Sanchez, testified that appellant would show up "every time we would go out." Sanchez stated that the first incident she remembered was when appellant showed up to her and Nydia's friend's house as the group was preparing to leave for prom. Sanchez noted that appellant was "passing [the house] by in the street." On another occasion, Sanchez, Nydia, and a group of friends including Clone were driving when appellant began following them. Nydia "dropped to the bottom" of her seat and started crying. The driver stopped at a gas station, appellant drove up next to the car, and Sanchez asked appellant, "What do you want? Just leave us alone. Nydia is not here." In response, appellant "just [said] that, [f]u[-]k that. He burned tire[s] and he left." Indeed, Sanchez stated that appellant would follow her and Nydia so often

11

that the two nicknamed appellant "the Ghost" and "the Fly." Sanchez also testified that on at least two occasions, appellant grabbed Nydia by the arm and dragged her away from the group of friends, stating that "he needed to talk to her." In one of those instances, appellant asked Nydia if she was dating Clone and stated that if she was that he "was going to fu[-]k them both up." Although untrue, Sanchez told appellant that she was dating Clone in an effort "to protect Nydia and protect Clone."

Sanchez was called to the police station at approximately 10:00 p.m. on October 31 and was interviewed until about 1:00 a.m. or 2:00 a.m. on November 1st. When told toward the end of the interview what had happened to Nydia, Sanchez immediately stated that "it was [appellant]."

Clone testified that he liked Nydia, but that their relationship never turned romantic. He stated that he did not fear appellant but feared that appellant would harm Nydia if he and Nydia began dating. Clone highlighted multiple instances where appellant threatened his life. He also testified that on one night when he and Nydia went to see a movie, appellant was waiting for the pair outside the theater upon their exit. Clone said appellant informed him and Nydia that "if [appellant] found out that [Clone and Nydia] were both going out together, he will kill us and that nothing will happen because his family got money."

Tony Chavez testified that he and Nydia met in 2003 and became boyfriend and girlfriend in 2004. Chavez noted that appellant would harass, stalk, and threaten the couple every time they went somewhere. Chavez testified that appellant had threatened him and Nydia, stating that appellant "had uncles that could kill [Chavez]" and appellant

12

"was going to get a gun and shoot [Chavez] and [Nydia]." Given the threats to his life, Chavez's family moved him from McAllen to Chicago, Illinois.

Two McAllen Independent School District police officers, Daniel Ortiz and Arturo Cordova, testified at trial that they encountered appellant on numerous occasions at their workplace. In 2005, both officers worked at Nikki Rowe High School. Ortiz testified that appellant was not a student at the school, but would frequently attempt to enter the premises to "check on his girlfriend." Ortiz stated that appellant handed him a business card and told Ortiz to call him if he saw "his girlfriend, Nydia," or saw "her with anybody else." This happened on two or three occasions. Ortiz ultimately warned appellant that further attempts to enter campus would result in a criminal trespass warning.

Cordova testified that on one occasion, appellant came up to the school gates and requested that he be able to go look for something in his girlfriend's car. Cordova let appellant onto campus and witnessed appellant search through Nydia's vehicle. Cordova testified that he saw appellant driving around campus on three or four occasions. Cordova also testified that appellant asked him "if [he had] ever seen [Nydia] leave campus during lunch periods or leave with somebody else, like a guy." Appellant handed Cordova a business card and asked the officer to call him if he ever saw Nydia with another guy. Cordova informed Nydia that "her boyfriend was here asking for you and asking a lot of questions" and stated that "she got like nervous."

E.    **Pre-Trial Suppression Hearing**[5]

Appellant moved to suppress his written statement of accused, arguing that it was

_____

[5] A suppression hearing was held in both trials; the first on June 15, 2006, and the second on June 16–17, 2008. We only consider testimony adduced at the 2008 hearing.

made involuntarily. His arguments centered on the circumstances of his interview. Specifically, appellant argued that: (1) he was in custody from the moment he entered the police station, given that it was a secure facility; (2) he was interrogated in cramped rooms; and (3) by the time he gave his statement, he had been awake for approximately thirty hours.

Blanco and Kucia testified at the suppression hearing to the facts mentioned above. Additionally, both the prosecution and appellant elicited further testimony from the investigators about the circumstances of appellant's questioning. Blanco said that he and appellant entered the police station through the back entrance, which Blanco testified was a normal practice as that is where he parks his vehicle. Blanco noted that besides the lobby, the police station building is an entirely secured facility, requiring a keycard or barcode to move throughout.

Blanco testified that appellant was free to leave the interview at any time, but that he never explicitly noted that. Blanco stated that appellant never requested a lawyer or to end the interview. When appellant needed to use the restroom throughout the questioning, Blanco accompanied him because "that's regular procedure" at the police station. Blanco denied ever threatening or using physical force or violence against appellant, and noted that his office is "maybe 8 by 8" with several chairs and a window.

Kucia testified that, like Blanco, he brought a witness into the station via the back entrance to interview in connection with the investigation into Nydia's murder. He stated that he interviewed other witnesses that night as well, all in his office at the police station.

Witnesses Villarreal and Hernandez testified that they were present when Kucia

14

administered the *Miranda* warnings and when appellant initialed each of the warnings at the top of his statement. The witnesses stated that appellant never asked to leave, never asked for an attorney, and looked like he understood everything that Kucia was saying. The witnesses noted that Kucia asked appellant if appellant wanted to make any changes to his statement, and appellant declined.

The defense called appellant to the stand. Appellant testified he was left alone at points of the initial interview with Blanco. He stated that the door to Blanco's office was closed, but that he was able to and did open the door. Appellant further testified that he left the room on at least one occasion. Appellant testified that, after he was transferred to an interrogation room, he opened the door to that room but an officer told him not to leave. Appellant testified that he was awake for approximately thirty hours by the time he gave his confession, that he was never read his *Miranda* warnings by Blanco or Kucia, that there were no witnesses in the room when he signed his statement, and that he believed he was signing a release form, not a confession.

The defense also elicited testimony from psychiatrist Michael Arambula, M.D. Arambula testified that he examined appellant on two occasions, two years apart. Based on the two examinations, Arambula diagnosed appellant with generalized anxiety disorder, "anxiety disorder not otherwise specified," obsessive-compulsive disorder, and claustrophobia. Given the circumstances of appellant's interrogation—being awake for approximately thirty hours, tight interrogation rooms, and high-anxiety conditions— Arambula posited that "when those circumstances came into fruition, [appellant] was willing to sign anything that would get him out . . . no matter how irrational it was."

15

Accordingly, appellant argued that his statement was obtained involuntarily.

The trial court denied appellant's motion to suppress.[6] The case proceeded to trial where appellant was convicted and sentenced to forty years' imprisonment. On December 26, 2018, appellant filed a motion for new trial, arguing insufficiency of the evidence. On January 4, 2019, appellant filed a new motion for new trial and included an additional ground based on alleged newly discovered evidence. The trial court did not rule on appellant's motion for new trial. This appeal followed.

## II.    MOTION TO SUPPRESS

By his first two issues, appellant argues that the trial court erred by denying his motion to suppress his statement of accused. Appellant argues that his statement was taken in violation of his (1) "constitutional and statutory rights against unlawful search and seizure" and (2) "constitutional and statutory protection(s) against self-incrimination." The State argues that appellant waived the first issue and, in any case, that both of appellant's arguments lack merit.

---

[6] The trial court stated its findings of fact and conclusions of law on the record at the suppression hearing but did not reduce them to writing as required by the Texas Code of Criminal Procedure. *See* TEX. CODE. CRIM. PROC. ANN. art. 38.22, § 6; *Vasquez v. State*, 411 S.W.3d 918, 920 (Tex. Crim. App. 2013) ("[W]ritten findings are required in all cases concerning voluntariness. [Article 38.22 § 6] has no exceptions."). We abated the appeal on February 7, 2022, for the trial court to file written findings of fact and conclusions of law. On March 4, 2022, the trial court informed this Court that it was seeking to temporarily appoint the visiting judge who presided over appellant's second trial in 2008 to prepare and file the findings and conclusions. On March 29, 2022, the trial court informed this Court that the visiting judge was unavailable and thus unable to prepare the required findings and conclusions. We received a supplemental clerk's record on April 21, 2022, with the relevant findings and conclusions prepared by the current district judge who, as it so happens, presided over appellant's first trial in 2006. *See* TEX. CODE. CRIM. PROC. ANN. art. 38.22, § 6; *see also Velez v. State*, No. AP-76,051, 2012 WL 2130890, at *13 (Tex. Crim. App. June 13, 2012) (not designated for publication) ("[W]here the prior judge is unavailable or ineligible for an appointment . . . to prepare findings of fact and conclusions of law, the current trial judge may prepare findings and conclusions based on the prior judge's ruling on the record and the transcript of the suppression hearing regarding whether a defendant's statement was voluntarily made.").

16

## A.    Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019); *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). First, we afford almost total deference to the trial court's findings of historical facts as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Abney v. State*, 394 S.W.3d 542, 547 (Tex. Crim. App. 2013). The trial judge is the sole judge of witness credibility and the weight to be given to witness testimony. *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). Second, we review de novo the trial court's application of the law to the facts. *See Valtierra*, 310 S.W.3d at 447. "As a general rule, appellate courts view the evidence in the light most favorable to the trial judge's ruling, regardless of whether the judge granted or denied the suppression motion." *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011) (footnote omitted). "Thus, courts afford the prevailing party 'the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.'" *Id.* (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)).

## B.    Unlawful Seizure

By his first issue, appellant argues that the trial court erred by denying his motion to suppress his statement of accused because the statement was the fruit of an unlawful seizure. The State argues that the record is "simply devoid" of any claim or objection on such grounds and, thus, the issue is waived. We agree that appellant waived this issue for appeal.

17

### 1.    Applicable Law

"A motion to suppress evidence is 'nothing more than a specialized objection to the admissibility of that evidence.'" *Sanders v. State*, 387 S.W.3d 680, 686 (Tex. App.— Texarkana 2012, no pet.) (quoting *Black v. State*, 362 S.W.3d 626, 633 (Tex. Crim. App. 2012)). "Filing a motion to suppress alone does not preserve any error in the admission of the evidence sought to be suppressed." *Id.* (citing *Coleman v. State*, 113 S.W.3d 496, 499–500 (Tex. App.—Houston [1st Dist.] 2003), *aff'd*, 145 S.W.3d 649 (Tex. Crim. App. 2004)); *see* TEX. R. APP. P. 33.1 (to preserve error for appeal, the record must show that a complaint was made to the trial court by "a timely request, objection, or motion" and that the court ruled on the request, objection, or motion). "If a motion to suppress has yet to be ruled on when the evidence is offered at trial, a defendant must object to the evidence at the time it is offered in order to preserve error." *Sanders*, 387 S.W.3d at 686 (citing *Ross v. State*, 678 S.W.2d 491, 493 (Tex. Crim. App. 1984); *Ortiz v. State*, 930 S.W.2d 849, 855 (Tex. App.—Tyler 1996, no pet.)). Almost all error, even constitutional errors, may be waived by failure to object. *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014). Furthermore, arguments on appeal must comport with arguments raised at a suppression hearing. *Sanders*, 387 S.W.3d at 686 (first citing *Rothstein v. State*, 267 S.W.3d 366, 373 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); then citing *Dunavin v. State*, 611 S.W.2d 91, 94–97 (Tex. Crim. App. 1981)).

### 2.    Analysis

Appellant filed two motions to suppress in this case, only one of which was ruled on at any stage of trial or referenced by the parties on appeal. In his first trial in 2006,

appellant filed (1) a general "motion to suppress evidence" (First Motion) and (2) a "motion to suppress oral and written statements of defendant" (Second Motion). Appellant's First Motion, which was never raised before the trial court or explicitly ruled on, stated that he was unlawfully seized in violation of his Fourth Amendment rights and that any written and oral statements should be suppressed.

In his Second Motion—filed in his first trial, refiled in his second trial in 2008, and ruled on in both his first and second suppression hearings—appellant advanced the following arguments:

(1)     "Officers were deceptive in that [they] did not disclose to [appellant] all the allegations [they were] investigating thereby limiting [appellant's] ability to effectively respond."

(2)     "Any statement or admissions of [appellant] were not made voluntarily and without compulsion or persuasion in violation of Article 38.21[7] of the Texas Code of Criminal Procedure, the Fifth and Fourteenth Amendments to the United States Constitution, and Article[] I, §§ 10 and 19 of the Texas Constitution."

(3)     "Any oral statements or admissions allegedly made by [appellant], resulted from custodial interrogation and were not taken in compliance with Article 38.22, [§] 3 of the Texas Code of Criminal Procedure[ 8 ]. . . . Such

---

[7] Article 38.21 provides: "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." TEX. CODE CRIM. PROC. ANN. art. 38.21.

[8] Article 38.22, § 2 concerns "written statements made by an accused as a result of custodial interrogations." *Id.* art. 38.22, § 2. Article 38.22, § 3 concerns an "oral or sign language statement of an

19

statements were also taken in violation of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, Article I, §§ 10 and 19 of the Texas Constitution, and *Miranda v. Arizona*, 384 U.S. 36 (1966)."

(4)     Appellant was unrepresented by counsel and unknowingly waived his right to counsel.

As noted above, by testifying and eliciting the testimony of Blanco, Kucia, and Dr. Arambula, appellant advanced the following arguments at the pre-trial suppression hearing:

(1)     Appellant's statement was involuntarily obtained, given that appellant was awake for thirty hours and "interrogated for a total of approximately 14 and a half hours, 13 and a half, give or take" at the time he signed his statement.

(2)     Appellant was in the custody of the MPD, notwithstanding testimony that appellant was free to leave the premises if he chose to do so.

(3)     There is no evidence that appellant was appropriately *Mirandized*.

(4)     Appellant's psychological disorders led to his involuntary signing of his statement of accused.

The trial court concluded that appellant was not in custody, found that the statement was made voluntarily, and denied appellant's motion to suppress.

Finally, at trial, when the State sought to introduce appellant's statement, appellant objected by stating:

Your Honor, if it please the Court, now comes [appellant], [who] respectfully moves the Court to suppress the confession for the reason that we have

accused made as a result of custodial interrogation." *Id.* § 3.

20

heretofore shown the Court. There is testimony before the Court that this confession could not and was not voluntarily given because there was no voluntariness. It was a coerced confession. It is not voluntary; and therefore under the Texas Codes of Criminal Procedure, the First, Fifth, and the Fourteenth Amendments of the United States Constitution, we respectfully submit, Your Honor, that [appellant's statement of accused] not be admitted, and we object to its admissibility on the issue of voluntariness based on testimony in evidence and heretofore before the Court. We reurge our Motion to Suppress the statement.

The trial court overruled appellant's objection.

In sum, then, the only motion raised and argued before the trial court was appellant's Second Motion. *See Coleman*, 113 S.W.3d at 499; *Sanders*, 387 S.W.3d at 686. None of the arguments raised in the Second Motion, the suppression hearing, or at trial and ruled on by the trial court deals with the issue of an unlawful seizure. *See Coleman*, 113 S.W.3d at 499; *Sanders*, 387 S.W.3d at 686. While appellant states that he was in custody, thus requiring certain warnings under *Miranda* and Article 38.22 of the Texas Code of Criminal Procedure to be given before making a statement, he never alleged before the trial court that such custody was *unlawful*. *See Sanders*, 387 S.W.3d at 686; *Rothstein*, 267 S.W.3d at 373. Accordingly, appellant waived his unlawful seizure argument on appeal. *See* TEX. R. APP. P. 33.1; *Yazdchi*, 428 S.W.3d at 844; *Ross*, 678 S.W.2d at 493; *Sanders*, 387 S.W.3d at 686; *Rothstein*, 267 S.W.3d at 373; *Coleman*, 113 S.W.3d at 499.

We overrule appellant's first issue.

## C. *Miranda* Warnings

By his second issue, appellant argues that the trial court erred by denying his motion to suppress his statement of accused because it was taken in violation of his right against self-incrimination. Specifically, he argues that his statement was not made

21

voluntarily because he was not properly warned of his *Miranda* or Article 38.22 rights. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a); *Miranda*, 384 U.S. at 436. We disagree.

### 1.     Applicable Law

"The Fifth Amendment to the United States Constitution commands that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) (quoting U.S. CONST. amend. V). In *Miranda v. Arizona*, the United States Supreme Court crafted safeguards to protect this "privilege against self-incrimination" in the inherently coercive atmosphere of custodial interrogations. 384 U.S. at 441. Under *Miranda*, "[p]rior to any [custodial] questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. Article 38.22 of the code of criminal procedure establishes additional procedural safeguards for securing the privilege against self-incrimination. TEX. CODE CRIM. PROC. ANN. art. 38.22. "The warnings provided in [§] 2(a) are virtually identical to the *Miranda* warnings, with one exception—the warning that an accused 'has the right to terminate the interview at any time' as set out in [§] 2(a)(5) is not required by *Miranda*." *Herrera*, 241 S.W.3d at 526. "As with the *Miranda* warnings, the warnings in [§] 2(a) of Article 38.22 are required only when there is custodial interrogation." *Id.*; *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a). Only "warned and waived" custodial statements may be admitted into evidence. *State v. Lujan*, 634 S.W.3d 862, 865 (Tex. Crim. App. 2021) (quoting *Oursbourn v. State*, 259 S.W.3d 159, 171 (Tex.

22

Crim. App. 2008)); *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2(b), 3(a)(2).

A defendant seeking the suppression of a statement on *Miranda* grounds has the threshold burden of clearly establishing that his statements were given during custodial interrogation. *Herrera*, 241 S.W.3d at 526. "A person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 321 (1994)). Texas law recognizes four general situations which may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement do not tell the suspect that he is free to leave. *Id.* at 255. The determination of custody is made on an ad-hoc basis, considering the totality of the circumstances. *See id.*; *State v. Saenz*, 411 S.W.3d 488, 496–97 (Tex. Crim. App. 2013).

### 2. Analysis

Under his argument on appeal that his statement of accused was involuntary for failure to receive the *Miranda* warnings, appellant argues that the entirety of his questioning was involuntary under *Miranda*. This argument was raised before the trial court and expressly overruled, so we address it here.

There were essentially three stages of appellant's questioning: (1) the initial discussion with Blanco; (2) the "accusatory" interview by Blanco; and (3) Kucia's

23

questioning. Appellant and the State do not dispute that appellant was in custody from the time he was placed in a holding cell and onward—including during Kucia's questioning and when appellant signed his statement of accused. The parties dispute whether appellant was "in custody" during stages one and two of his questioning and whether he was properly administered the required *Miranda* and Article 38.22 warnings at any stage.

Investigators Blanco and Kucia each testified at the suppression hearing and trial that they administered the *Miranda* and Article 38.22 warnings in the latter two stages of appellant's questioning and that, nonetheless, appellant agreed to be interviewed. Witnesses Villarreal and Hernandez testified at the suppression hearing that Kucia *Mirandized* appellant when he began taking appellant's statement and, nevertheless, appellant elected to give a full statement. And appellant's statement of accused indicates that he initialed next to each of the Article 38.22 warnings listed at the top of his statement and acknowledged that he knowingly and voluntarily waived those rights. Appellant, however, testified at the suppression hearing that, in fact, he was not *Mirandized* at any stage of his questioning and he thought he was signing a release form, not a confession. The trial court found that appellant was given the proper warnings and admitted appellant's statement. That finding is supported by the record, and we defer to it.[9] *See Ex parte Moore*, 395 S.W.3d at 158; *Valtierra*, 310 S.W.3d at 447. Consequently, we need not address whether appellant was in custody in stages two and three of his questioning

---

[9] Appellant also argues that his statement may have been involuntary under a "question first, warn later" theory, given that he signed the warnings on his statement only after it was typed. *See Carter v. State*, 309 S.W.3d 31, 36 (Tex. Crim. App. 2010) (citing *Missouri v. Seibert*, 542 U.S. 600, 616 (2004)). However, as noted, the evidence in the record, including the trial court's voluntariness ruling, establishes that Kucia properly warned appellant of his rights before taking appellant's statement, and that appellant thereafter agreed to give and sign the statement.

because, even if he was, the record reflects that appellant was properly given the *Miranda* and Article 38.22 warnings and elected to answer the investigators' questions in those stages. *See Miranda*, 384 U.S. at 444; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a).

As to the first stage of appellant's questioning, Blanco testified that appellant voluntarily agreed to accompany him from the crime scene to the police station to continue answering questions. While appellant notes that he had to drive with Blanco because his car was within the taped-off crime scene, he does not deny that he voluntarily agreed to accompany Blanco to the police station or that he was cooperating with the police. *See Dancy v. State*, 728 S.W.2d 772, 778 (Tex. Crim. App. 1987) ("We are unaware of any rule of law which forbids lawfully constituted officers of the law from requesting persons to accompany them, or of providing transportation to the police station . . . in furtherance of an investigation of a crime. . . . If the circumstances show that the transportee is acting only upon the invitation, request, or even urging of the police, and there are no threats, express or implied, that he will be taken forcibly, the accompaniment is voluntary, and such person is not then in custody . . . ."); *Hawkins v. State*, 592 S.W.3d 602, 610 (Tex. App.—Corpus Christi–Edinburg 2020, pet. ref'd) (concluding appellant was not in custody when given a courtesy ride to a hospital by police). Blanco and appellant testified that appellant was not a suspect or detained at that point, and appellant was not handcuffed or restrained while riding in the front seat of Blanco's police vehicle.

Blanco testified that appellant was free to leave at any point during the initial questioning, as appellant was not considered a suspect at that time. Appellant elicited

25

testimony from multiple MPD investigators that the police station is a secure facility, requiring a keycard or barcode to move throughout. However, appellant testified that the door to Blanco's office was unlocked, and appellant left the office on at least one occasion to, among other things, use the telephone. Moreover, appellant was left alone for a period of about two hours and was not restrained during that time. *See Espinoza v. State*, 185 S.W.3d 1, 4 (Tex. App.—San Antonio 2005, no pet.) (concluding appellant was not in custody given, among other things, that she went to the police station voluntarily, was never handcuffed, was permitted to use the restroom, was never told she could not leave the police station, and was in a closed but unlocked interview room alone for two hours). Finally, testimony at trial made clear that appellant was not the only person brought to the police station for questioning. Investigators questioned multiple individuals at the police station on the night of October 31 into the early morning of November 1, including Clone and Sanchez. *See Dowthitt*, 931 S.W.2d at 255 ("Stationhouse questioning does not, in and of itself, constitute custody.").

Under the totality of these circumstances, we conclude as a matter of law that appellant was not in custody during Blanco's initial questioning. *See id.* A reasonable person would not believe that his freedom of movement was restrained to the degree associated with a formal arrest in light of the particular facts of this case. *See Nguyen v. State*, 292 S.W.3d 671, 677 (Tex. Crim. App. 2009); *Saenz*, 411 S.W.3d at 496–97.

At all stages of his questioning, appellant was either (1) not in custody or (2) properly warned of his *Miranda* and Article 38.22 rights. Accordingly, we conclude that the trial court did not err by denying appellant's motion to suppress his statement of

26

accused. On appeal, appellant does not challenge the voluntariness of his statements on any other grounds.[10]

We overrule appellant's second issue.

### III.    JURY INSTRUCTIONS

By his third issue, appellant argues that the trial court erred by failing to properly instruct the jury on the law applicable to the case. Specifically, appellant alleges the trial court erred by failing to submit (1) an instruction on the statutory exclusionary rule contained in Article 38.23 of the Texas Code of Criminal Procedure, and (2) an instruction on the statutory warnings rule under Article 38.22, § 7 of the Texas Code of Criminal Procedure.

### A.    Standard of Review

In reviewing a challenge to a jury charge, we first must determine if the jury charge contained error. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If error is found, we then "analyze the harm resulting from the error." *Id.* If "an error is preserved with a timely objection . . . then the jury-charge error requires reversal if the appellant suffered some harm as a result of the error." *Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). But if the "defendant never presents a proposed jury instruction (or fails to object to the lack of one), any potential error in the charge is reviewed only for 'egregious harm' under *Almanza*." *Oursbourn*, 259 S.W.3d at 174. "Egregious harm deprives appellant of

---

[10] In particular, appellant does not raise a general voluntariness challenge under code of criminal procedure Article 38.22, § 6. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6; *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008).

a fair and impartial trial." *Trejo v. State*, 313 S.W.3d 870, 871 (Tex. App.—Houston [14th Dist.], pet. ref'd.) (citing *Almanza*, 686 S.W.2d at 171). "Errors that result in egregious harm are those that affect the 'very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Warner v. State*, 245 S.W.3d 458, 461–62 (Tex. Crim. App. 2008) (quoting *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

**B.    Applicable Law**

The jury charge must "distinctly set[] forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14. "[W]here a rule or statute requires an instruction under the particular circumstances, that instruction is 'the law applicable to the case.'" *Oursbourn*, 259 S.W.3d at 180. "Such statutes and rules set out an implicit 'If-then' proposition: If the evidence raises an issue of [voluntariness, accomplice witness, confidential informant, etc.], then the trial court shall instruct the jury [on whatever the statute or rule requires]." *Id.* (brackets in original). Even if an instruction is not requested, the trial court has a duty to instruct the jury sua sponte on such statutes and rules. *See id.* at 179; *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) ("The trial judge has an absolute sua sponte duty to prepare a jury charge that accurately sets out the law applicable to the specific offense charged.").

As noted above, under Article 38.21 of the Texas Code of Criminal Procedure, "[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21.

28

A defendant may claim that his statement was not freely or voluntarily made and thus may not be used as evidence against him under several theories: (1) Article 38.22, § 6—general voluntariness; (2) *Miranda v. Arizona* as expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause. It may be involuntary under one, two, or all three theories. A statement that is "involuntary" as a matter of constitutional law is also "involuntary" under Article 38.22, but the converse need not be true. The theory of involuntariness determines whether and what type of an instruction may be appropriate. Thus, the first step in deciding upon an appropriate jury instruction is identifying the theory of involuntariness.

*Oursbourn*, 259 S.W.3d at 169 (footnotes omitted).

### 1. Due Process & *Miranda*

A confession can be "involuntary under the Due Process Clause only when there is police overreaching." *Id.* "Even if a confession is not the product of a meaningful choice (for example, when made in response to hallucinations or to a private person's threat), it is nonetheless 'voluntary' within the meaning of the Due Process Clause absent some coercive police activity." *Id.* at 170. The same is true for a claim of involuntariness based on the lack of *Miranda* warnings. *Id.* "Coercive government misconduct renders a confession involuntary if the defendant's 'will has been overborne and his capacity for self-determination critically impaired.'" *Contreras v. State*, 312 S.W.3d 566, 574 (Tex. Crim. App. 2010) (quoting *Schneckloth v. Bustamante*, 412 U.S. 218, 225–26 (1973)).

Due-process and *Miranda* involuntariness claims "do not require 'sweeping inquiries into the state of mind of a criminal defendant who has confessed.' They involve an objective assessment of police behavior." *Oursbourn*, 259 S.W.3d at 171 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

### 2. Texas Confession Statute

"The Constitution leaves voluntariness claims based on the defendant's state of

mind 'to be resolved by state laws governing the admission of evidence.'" *Id.* In Texas, Article 38.22 serves that function. Article 38.22 "sets out rules governing the admissibility of an accused's written and oral statements." *Id.* at 171. Unlike due process and *Miranda* claims, claims of involuntariness under Article 38.22 "can be, but need not be, predicated on police overreaching." *Id.* at 172. Article 38.22, § 6 "applies to *both* an accused's custodial and non-custodial statements because it provides that only 'voluntary' statements may be admitted." *Id*. at 171. On the other hand, §§ 2 and 3 apply only to an accused's custodial statements, and "provide that only 'warned and waived' statements may be admitted." *Id.*

### 3. Jury Instructions on Voluntariness

Under Texas statutory law, there are three types of [jury] instructions that relate to the taking of confessions: (1) a 'general' Article 38.22, § 6 voluntariness instruction[11]; (2) a 'general' Article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3)[12]; and (3) a 'specific' Article 38.23(a) exclusionary-rule instruction[13].

---

[11] Article 38.22, § 6 of the Texas Code of Criminal Procedure states, in part:

Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof. . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6.

[12] Article 38.22, § 7 states: "When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement." *Id.* art. 38.22, § 7.

[13] Article 38.23(a) states:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case. In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in

*Id.* at 173. "The [§] 6 'general' instruction asks the jury: 'Do you believe, beyond a reasonable doubt, that the defendant's statement was voluntarily made? If it was not, do not consider the defendant's confession.'" *Id.* "The [§] 7 instruction sets out the [warnings] requirements of [Article] 38.22, § 2 or § 3 and asks the jury to decide whether all of those requirements were met." *Id.* "The Article 38.23(a) 'specific' instruction is fact-based: For example, 'Do you believe that Officer Obie held a gun to the defendant's head to extract his statement? If so, do not consider the defendant's confession.'" *Id.* at 173–74.

### i. Article 38.22, § 6 Instruction Applicability

Article 38.22, § 6 is "'the law applicable' to any case in which a 'question' is raised and litigated as to the 'general' voluntariness of a statement of an accused." *Id.* at 180 (internal quotations omitted). If § 6 is applicable, "[t]he trial judge must then (1) make an independent determination that the statement was made under voluntary conditions; and then (2) instruct the jurors that they shall not consider the statement for any purpose unless they believe, beyond a reasonable doubt, that the statement was made voluntarily." *Id.* at 180–81. Ultimately, a general voluntariness instruction is required only when a reasonable jury could conclude, based on disputed or undisputed evidence, that the statement was not made voluntarily. *Id.* at 181.

### ii. Article 38.22, § 7 Instruction Applicability

Under Article 38.22, § 7, "[i]f the defendant made his statement as the result of custodial interrogation, he is also entitled—when the issue is raised by the evidence—to

violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

*Id.* art. 38.23(a).

31

have the jury decide whether he was adequately warned of his rights and knowingly and intelligently waived these rights." *Id.* at 176. "The phrase 'the issue' refers to compliance with the statutory warnings set out in . . . Article[] . . . 38.22, §§ 2 & 3, and the voluntariness of the defendant's waiver of the rights." *Id.* For it to be "raised by the evidence" there must be a genuine factual dispute, just as with Article 38.23 issues. *Id.* "As with [§] 6, the trial judge's [§] 7 jury instructions are 'general' ones that set out the pertinent law and legal requirements of [§§] 2 and 3." *Id.*

### iii.     Article 38.23 Instruction Applicability

Article 38.23 is "'the law applicable' to any case in which a specific, disputed issue of fact is raised concerning the constitutional voluntariness of the making of the defendant's statement." *Id.* at 181. "These are statutorily mandated instructions and the trial judge must include them in the jury instructions when the voluntariness of a defendant's statement is at issue." *Id.*

To be entitled to an Article 38.23 instruction,

a defendant must establish three foundation requirements . . . . (1) the evidence heard by the jury must raise an issue of fact; (2) the evidence on that fact must be affirmatively contested; and (3) the contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary.

*Id.* at 177. "The defendant must offer evidence that, if credited, would create a reasonable doubt as to a specific factual matter essential to the voluntariness of the statement." *Id.*; *see Madden v. State*, 242 S.W.3d 504, 513 (Tex. Crim. App. 2007). Disputed evidence must be brought forth by an appropriate witness. *Oursbourn*, 259 S.W.3d at 177. "The cross-examiner cannot create a factual dispute for purposes of an Article 38.23(a) instruction merely by his questions. It is only the answers that are evidence and may

32

create a dispute." *Madden*, 242 S.W.3d at 514. "[I]f there is a disputed fact issue about whether [a] coercive practice was employed—by either an officer or a private citizen—to wring a confession out of a suspect against his will, a specific exclusionary-rule instruction under Article 38.23 is appropriate." *Oursbourn*, 259 S.W.3d at 178.

**C.      Analysis**

In this case, the trial court charged the jury with a general voluntariness instruction under Article 38.22, § 6. Specifically, the jury charge stated:

> You are instructed that unless you believe from the evidence beyond a reasonable doubt that the alleged statement of [appellant] introduced into evidence was freely and voluntarily made by [appellant] without compulsion or persuasion, or if you have a reasonable doubt thereof, you shall not consider such alleged statements for any purpose nor any evidence obtained as a result thereof.

Appellant did not request or object to the absence of instructions on Article 38.22, § 7 or Article 38.23 voluntariness, but appellant alleges the trial court should have so instructed the jury sua sponte. *See* TEX. CODE CRIM. PROC. ANN. arts. 38.22, § 7, 38.23. The State argues that the appropriate instruction was given in the jury charge because appellant did not raise a factual issue entitling him to Article 38.22, § 7 or Article 38.23 instructions. *See id.* We agree with the State.

Appellant insists that

> There were various factual issues raised during the trial—1) whether Appellant was unlawfully seized in violation of his 4th Amendment rights; 2) whether Appellant was adequately and sufficiently admonished of his rights, as contemplated by *Miranda v. Arizona* and articles 38.21–38.23; and 3) whether police conduct in this case was "overreaching" as contemplated by the Due Process Clause.

As we have previously concluded, the issue of unlawful seizure was never raised at trial. Therefore, appellant was not entitled to an Article 38.22, § 6 instruction. Moreover, as

33

discussed further below, the trial evidence did not create a disputed fact issue as to whether appellant was properly administered his *Miranda* and Article 38.22 warnings or questioned in violation of his constitutional rights.

### 1. Article 38.22, § 7 Instruction

Appellant alleges that "there was evidence raising the issue regarding whether Appellant was properly admonished of his statutory rights pursuant to Article 38.22." Such "evidence," appellant states, was the absence of sufficient evidence indicating that he was properly warned of his rights. While acknowledging that investigators Blanco and Kucia testified that they warned appellant of his rights, appellant argues that "the record is empty regarding which, if any, of the required warnings were actually given to Appellant" by the investigators.

In fact, the record evidences the warnings given to appellant. Blanco testified that he read the *Miranda* warnings to appellant when he started interrogating him. The State asked Blanco if he informed appellant of his right to a lawyer, and Blanco answered, "Yes, ma'am, I did." The State asked Blanco if appellant asked for a lawyer, and Blanco answered, "No ma'am, he did not." The State asked Blanco if he told appellant that he had the right to remain silent, and Blanco answered, "Yes, ma'am." The State asked Blanco if he told appellant that he could end the interview at any time, and Blanco answered, "Yes, ma'am, I did." The State asked Blanco if appellant "look[ed] like he understood the warnings," and Blanco answered, "Yes ma'am." And the State asked Blanco if appellant nonetheless agreed to continue talking with him, and Blanco answered, "Yes, ma'am, he did agree."

34

Similarly, Kucia testified that, when he first began his interview with appellant, he "reread him the *Miranda* warnings." The State asked Kucia whether he told the defendant that he had a right to an attorney present, and Kucia answered, "Yes, I did." The State asked Kucia whether he informed appellant of his right to remain silent, and Kucia answered, "Yes, I did." The State asked Kucia if he informed appellant that he could terminate the interview at any time, and Kucia answered, "Yes." Kucia testified that, nonetheless, appellant still wished to speak with him and did not ask to end the interview. Moreover, Kucia and witnesses Hernandez and Villarreal each testified that they witnessed appellant read understand, and initial each of the Article 38.22 warnings printed on his statement of accused.

The defense elicited no testimony at trial on direct or cross-examination to raise a fact issue as to whether appellant was properly warned of his *Miranda* and Article 38.22 rights. While appellant's trial counsel insinuated through his questioning on cross-examination that Kucia did not initially read appellant the *Miranda* warnings, no evidence was adduced to contradict Kucia's testimony. *See Madden*, 242 S.W.3d at 514. The only testimony that could potentially do so in this case was appellant's testimony that he was never read his *Miranda* rights. However, appellant's testimony in this regard was only elicited at the pre-trial suppression hearing, not before the jury at trial. Accordingly, appellant was not entitled to an Article 38.22, § 7 voluntariness instruction. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 7; *Oursbourn*, 259 S.W.3d at 176; *Vasquez v. State*, 225 S.W.3d 541, 545 (Tex. Crim. App. 2007) (noting that, although a defendant may be entitled to an Article 38.22 jury instruction even when the evidence is undisputed, "[s]ome

evidence must have been presented to the jury that the defendant's confession was not given voluntarily"). Thus, the trial court did not err by not sua sponte including the instruction in the jury charge.

### 2. Article 38.23 Instruction

Appellant further alleges that "[t]here were also disputed factual issues raised concerning the legality/constitutionality in obtaining Appellant's Statement." Appellant directs us to "evidence that Appellant was unlawfully detained and held in a jail cell until he gave a confession." The behavior of the MPD officers, appellant urges, "is the type of 'overreaching' that implicates the Due Process Clause—it was certainly used to coerce Appellant into giving a statement of accused, whether true or untrue." The State argues that the issue of illegal seizure is a legal determination resting solely with the trial court, not the jury, and that no factual dispute exists which would necessitate an Article 38.23 instruction.

As with Article 38.22, § 7, to be entitled to an Article 38.23 instruction, there must be, *inter alia*, a disputed issue of fact. *Oursbourn*, 259 S.W.3d at 177. Recall the example above of an Article 38.23 specific jury instruction: "For example, 'Do you believe that Officer Obie held a gun to the defendant's head to extract his statement? If so, do not consider the defendant's confession.'" *Id.* at 173–74.

> The officer in our hypothetical may deny, on cross-examination, that he held a gun to the defendant's head to extract the confession. The implication by counsel, that the officer did perform that act, does not, by itself, raise a disputed fact issue. But if the defendant (or some other witness) testifies that the officer held a gun to his head, then a disputed fact issue exists. And the jury must resolve that disputed fact issue.
>
> If the jury finds that the officer did hold a gun to the defendant's head, the statement is involuntary as a matter of federal constitutional law. If the jury

finds the officer did not do so, the statement is not constitutionally involuntary. *Of course, if there is no disputed factual issue . . . the legality of the conduct is determined by the trial judge alone, as a question of law. The legal question would never go to the jury*.

*Id.* at 177–78 (emphasis added).

As the State correctly notes, there was no error in the absence of an Article 38.23 jury instruction regarding unlawful detention because no fact issue existed as to the circumstances surrounding the claim. *See id.* at 176; *Madden*, 242 S.W.3d at 513. The trial testimony establishes that appellant was *Mirandized*, and there is no dispute that appellant was at the police station being questioned intermittently for approximately fourteen hours—one of which was spent in a holding cell. And if "there is no factual issue of how evidence was obtained, there is only an issue of law, which is not for a jury to decide under article 38.23(a)." *Vasquez*, 225 S.W.3d at 545. Accordingly, appellant was not entitled to an Article 38.23 instruction.

Because appellant was not entitled to Article 38.22, § 7 or Article 38.23 instructions, we conclude that the trial court did not err by failing to charge the jury with the same. *See Oursbourn*, 259 S.W.3d at 176–77. Accordingly, we need not analyze the absence of such instructions for egregious harm. *See Price*, 457 S.W.3d at 440; TEX. R. APP. P. 47.1.

We overrule appellant's third issue.

### IV. INEFFECTIVE ASSISTANCE OF COUNSEL

By his fourth issue, appellant argues that his trial counsel was ineffective, given counsel's failure to request Article 38.22, § 7 and Article 38.23 jury instructions. The State argues that appellant's ineffective assistance of counsel claim "is wholly lacking in merit."

## A.    Applicable Law

We measure counsel's performance by the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Ex parte Garcia*, 486 S.W.3d 565, 568 (Tex. Crim. App. 2016). "First, an applicant must demonstrate deficient performance by showing that his attorney's representation fell below an objective standard of reasonableness, as judged by prevailing professional norms." *Id.* at 568–69 (citing *Strickland*, 466 U.S. at 690). To do so, an applicant must overcome the strong presumption that counsel's conduct was reasonable. *Strickland*, 466 U.S. at 687. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. The right to assistance of reasonably effective counsel "does not mean errorless or perfect counsel whose competency of representation is to be judged by hindsight." *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

Second, an applicant must demonstrate prejudice by establishing that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 696; *Ex parte Martinez*, 330 S.W.3d 891, 903–04 (Tex. Crim. App. 2011). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

**B.    Analysis**

Appellant claims that his trial counsel was ineffective because counsel failed to request jury instructions under Article 38.22, § 7 and Article 38.23(a). *See* TEX. CODE CRIM. PROC. ANN. arts. 38.22, § 7, 38.23(a). As previously noted, because there was no issue of material fact as to the lawfulness of appellant's interview and detention, appellant was not entitled to such jury instructions. *See Oursbourn*, 259 S.W.3d at 176; *Madden*, 242 S.W.3d at 513. And "[a]ppellant's trial counsel's failure to request an instruction to which appellant was not entitled is not ineffective assistance." *Cummings v. State*, 401 S.W.3d 127, 132 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *see Ford v. State*, 282 S.W.3d 256, 267 (Tex. App.—Austin 2009, no pet.) (holding that because appellant was not entitled to an Article 38.23(a) jury instruction, trial counsel was not ineffective by failing to request one); *see also McCutcheon v. State*, No. 14-19-00295-CR, 2021 WL 4957213, at *6 (Tex. App.—Houston [14th Dist.] Oct. 26, 2021, pet. ref'd) (mem. op., not designated for publication) (same).

Accordingly, we overrule appellant's fourth issue.

## V.    EXTRANEOUS-MATTER EVIDENCE

By his fifth issue, appellant argues that the trial court erroneously admitted the testimony of Officers Ortiz and Cordova, Gonzalez, Clone, Chavez, Sanchez, and Jorge regarding appellant's past statements and actions in violation of Texas Rules of Evidence 401 (Test for Relevant Evidence), 403 (Excluding Relevant Evidence for Prejudice, Confusion, or Other Reasons), and 404(b) (Character Evidence; Crimes or Other Acts). The State argues that appellant failed to preserve this issue for appellate review. We

39

agree with the State.

**A.    Applicable Law**

Under Texas Rules of Evidence 401 and 402, relevant evidence is admissible unless otherwise provided in the rules. *See* TEX. R. EVID. 401, 402. Rule 404(b) provides generally that evidence of extraneous offenses, such as a "crime, wrong, or other act," is "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Id.* R. 404(b)(1). However, such evidence may be admissible for "another purpose," such as proving "intent, preparation, plan, knowledge, [or] identity." *Id.* R. 404(b)(2).

As noted, Rule 33.1(a) of the Texas Rules of Appellate Procedure provides that a complaint is not preserved for appeal unless it was made to the trial court "by a timely request, objection, or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). "A general objection will not preserve error unless the legal basis is obvious to the trial court and opposing counsel." *Gonzalez v. State*, 616 S.W.3d 585, 591 (Tex. Crim. App. 2020), *cert. denied*, 142 S. Ct. 436 (2021). "A complaint is obvious if there are 'statements or actions on the record that clearly indicate what the judge and opposing counsel understood the argument to be.'" *Id.* (quoting *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012)); *see Resendez v. State*, 306 S.W.3d 308, 312–13 (Tex. Crim. App. 2009) ("Although there are no technical considerations or forms of words required to preserve an error for appeal, a party must be specific enough so as to

40

'let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" (citing *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992))). "The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; [and] (2) to give opposing counsel the opportunity to respond to the complaint." *Resendez*, 306 S.W.3d at 312.

Furthermore, a "point of error on appeal must comport with the objection made at trial." *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *see Sanders*, 387 S.W.3d at 686. Accordingly, for example, a Rule 404(b) objection at trial will not preserve a Rule 403 complaint on appeal. *See Bell v. State*, 938 S.W.2d 35, 49 (Tex. Crim. App. 1996) (concluding that the issue of whether evidence was "highly prejudicial" was not properly presented for appellate review because appellant raised an objection based on Rule 401 at trial but "did not raise a separate trial objection to the evidence based upon Rule 403"); *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1990) (op. on reh'g) (holding that an objection based on Rule 403 is required before the trial court will balance probativeness and prejudice).

## B. Analysis

The record entirely lacks a Rule 403 objection in a pre-trial hearing or at trial. Accordingly, appellant's Rule 403 argument on appeal is waived. *See* TEX. R. APP. P. 33.1; *Bell*, 938 S.W.2d at 49; *Montgomery*, 810 S.W.2d at 388.

The record reflects two instances in which appellant invoked Rule 404(b). The first

was in a pre-trial hearing. Appellant's trial counsel stated the following: "My motion number two is a request for notice of the State's intent to introduce evidence under 37.07, § 3 of the Texas Code of Criminal Procedure,[14] extraneous offenses." The State informed the court that, pursuant to Rule 404(b)(2), it had provided appellant with reasonable notice of its intent to use such evidence. Appellant's trial counsel subsequently objected to the notice as untimely. The trial court disagreed and ruled that the notice was timely. On appeal, appellant does not raise a timeliness of notice argument under either Article 37.07, § 3 or Rule 404(b)(2). Accordingly, any such argument is waived. *See* TEX. R. APP. P. 33.1; *Wilson*, 71 S.W.3d at 349; *Sanders*, 387 S.W.3d at 686.

The second instance was immediately before the jury was called in on the first day of trial. According to the trial transcript, appellant's trial counsel stated:

> We want to object before the jury is brought in as to any extraneous offenses such as stalking. Stalking is a crime in and of itself. It cannot come in unless there is conviction for that crime.

> The only way they could bring it in, Your Honor, would be under 404(b) extraneous offenses. The Rules of Evidence specifically require [under] 404(b) that they file a notice before trial. No such notice has been filed in this case.

The State informed the court that it did file a notice of its intent to use extraneous-matter evidence, and that it had "looked at it over" with appellant's trial counsel. *See* TEX. R. EVID. 404(b)(2) ("On timely request by a defendant in a criminal case, the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce [404(b)] evidence—other than that arising in the same transaction—in its case-in-chief."). The

---

[14] Article 37.07, § 3 of the Texas Code of Criminal Procedure requires the State to provide notice of its intent to use character evidence in the punishment phase of trial. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g).

State also argued that it was not using any evidence to prove bad character, as is disallowed by Rule 404, but only "for state of mind, motive, opportunity, intent," and, in any event, that the evidence is "admissible under [Article] 38.36 . . . as a prior relationship."[15] Appellant's trial counsel responded by noting again that he believed the State's notice was untimely, as it was sent only seven days before trial. The trial court ruled that the 404(b) evidence "is not a surprise and [is] allowable." Appellant's trial counsel responded that the court should "please note our exception. This is violative of 404(b)."

Appellant's trial counsel made one final note, stating he "would reurge that the Court admonish the State not to bring in stalking. They can say, following, looking for . . . ." The trial court ruled that the State could not use the word "stalking," and the State agreed not to. Appellant did not further object to 404(b) evidence at trial. Accordingly, the only rulings the trial court made were that (1) the State's notice of intent to introduce extraneous-matter evidence was timely and (2) the State was barred from using the term "stalking" at trial. Because none of appellant's points of error on appeal comports with these two trial court rulings, the arguments are waived. *See* TEX. R. APP. P. 33.1; *Resendez*, 306 S.W.3d at 312; *Wilson*, 71 S.W.3d 349.

We note, finally, that to the extent that appellant's trial counsel's second Rule 404(b) objection can be read as two distinct objections—that is, reading as separate his

---

[15] *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(a) ("In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.").

43

statement that, "We want to object before the jury is brought in as to any extraneous offenses such as stalking"—such a broad objection failed to "be specific enough so as to 'let the trial judge know what [appellant] want[ed], why [appellant] th[ought] himself entitled to it, and do so clearly enough for the judge to understand [appellant] at a time when the trial court [was] in a proper position to do something about it.'" *Resendez*, 306 S.W.3d at 312–13. Neither the record nor the court's ruling "clearly indicates" that the trial judge understood appellant's argument to encompass any of the specific testimony appellant complains of on appeal. *See Gonzalez*, 616 S.W.3d at 591. Indeed, the trial court ruled on appellant's 404(b) objection before even one witness testified at trial, and only based its ruling on timeliness of notice grounds. Accordingly, appellant's extraneous-matter evidence arguments are waived. *See id.*; *Resendez*, 306 S.W.3d at 312; *Wilson*, 71 S.W.3d 349; TEX. R. APP. P. 33.1.

We overrule appellant's fifth issue.

## VI.    MOTION FOR NEW TRIAL

By his sixth and final issue, appellant contends that the trial court erred by denying his "motion for new trial based on newly discovered evidence."

### A.    Standard of Review & Applicable Law

We review the denial of a motion for new trial for abuse of discretion. *See Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). A motion for new trial must be filed within thirty days after sentence is imposed or suspended in open court. TEX. R. APP. P. 21.4(a); *see State v. Arizmendi*, 519 S.W.3d 143, 150 (Tex. Crim. App. 2017); *State v. Zalman*, 400 S.W.3d 590, 593 (Tex. Crim. App. 2013). The motion can be amended at

44

any time during that thirty-day period, but the trial court is barred from considering a ground raised outside the thirty-day period if the State properly objects. *Arizmendi*, 519 S.W.3d at 150; *Zalman*, 400 S.W.3d at 593; *see* TEX. R. APP. P. 21.4(b). Consequently, a trial court errs by ruling on an untimely motion for new trial if the State has properly objected. *See Zalman*, 400 S.W.3d at 595; *State v. Moore*, 225 S.W.3d 556, 569–70 (Tex. Crim. App. 2007).

## B. Analysis

Appellant's sentence was pronounced on November 26, 2018. On December 26, 2018, appellant filed a motion for new trial, arguing the following:

> [Appellant] is asking for New Trial based on the sufficiency of the evidence to convict. A close look at the record would clearly indicate that there was no evidence to establish that the defendant was anywhere near the scene when the incident occurred. In the alternative the Defendant would ask for extension of time to file further pleadings in connection with this request for new trial.

On January 4, 2019, thirty-nine days after appellant's sentence was imposed, appellant filed a second motion for new trial which incorporated additional grounds for relief, including:

1. The evidence is legally and factually insufficient to support [appellant's] conviction.

2. [Appellant] was denied [a] fair trial, due process, and [due] course of law guaranteed by the constitutions of Texas and the United States.

3. A new trial should be granted in the interest of justice.

4. New evidence has been discovered since the trial.

That same day, the State objected to, and moved to strike, appellant's second motion for new trial, arguing that it was untimely under Texas Rule of Appellate Procedure 21.4. *See*

45

TEX. R. APP. P. 21.4.

At the February 11, 2019 motion for new trial hearing, the State once again objected to the "new evidence" claims. Nonetheless, "out of an abundance of caution," the trial court heard evidence on the claims. The record does not contain the trial court's ruling, but the ruling is not particularly relevant to this appeal. Because appellant's motion for new trial on the grounds of newly discovered evidence was untimely, and because the State timely objected thereto, the trial court was barred from considering the new evidence grounds. *See Arizmendi*, 519 S.W.3d at 150; *Zalman*, 400 S.W.3d at 593; *Moore*, 225 S.W.3d at 569–70; TEX. R. APP. P. 21.4(b). Appellant raises no other grounds for review on appeal on his new trial claim.

We thus overrule appellant's sixth issue.

## VII.    CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
26th day of May, 2022.